### HAMMOND v. THE STATE.

ATKINSON, J.  1.  A defendant in a criminal case who has been convicted has the legal right to demand a poll of the jury.  The demand should be made after the verdict is read, but before dispersion of the jury. *Malone* v. *State*, 49 *Ga.* 210 (11); *Tilton* v. *State*, 52 *Ga.* 478.  It will be too late if not made until after the sentence of the court has been pronounced.  *Robinson* v. *State*, 109 *Ga.* 506 (8) (34 S. E. 1017); *Davis* v. *State*, 22 *Ga. App.* 802 (97 S. E. 273).  A ground of the motion for new trial alleged that the verdict was returned and published, and that the court immediately dismissed the jury and passed sentence on the defendant without affording him an opportunity to poll the jury. The court refused to approve this ground in its entirety, and appended a note which stated that after the verdict was received and read the court proceeded to give certain directions to the officers of the court, which consumed about five minutes before dismissal of the jury, during which time the attorney for the defendant was present and made no demand or request to have the jury polled, and there was nothing to prevent the attorney from making the demand if he desired to do so. *Held*, that there is no merit in this ground of the motion.

2. In the course of his argument before the jury the solicitor-general stated: "Gentlemen of the jury, this defendant, his mother, wife, and child out in the anteroom were posing for a picture for the newspaper, and the newspaper men were being lined up for their pictures." The defendant's attorney made a motion for a mistrial on the ground that the argument was not authorized by the evidence, and was improper and prejudicial.  The court remarked, "Well, the court does not see how it could prejudice the defendant's rights whether he has his picture made or whether he did not."  Following this remark the solicitor-general stated: "Your honor, if he . . objects to it I withdraw it."  The defendant's attorney immediately objected to this remark.  The court overruled the motion for a mistrial, but instructed the jury as follows: "Well, the court does not see how it could prejudice the defendant's rights whether he has his picture made or whether he did not.  Gentlemen of the jury, you would not allow any remarks of counsel to influence your verdict one way or the other, any remark that is not based upon the evidence in this case, if such have been made.  I do not know what the remarks were.  If counsel in his argument made any reference to a matter not in evidence, you will disregard it."  *Held*, that there was no error in refusing to declare a mistrial.

3. The evidence was sufficient to support the verdict.

*Judgment affirmed.  All the Justices concur.*

No. 6341.  APRIL 12, 1928.

Murder.  Before Judge Wood.  Fulton superior court.  October 6, 1927.

759 was the number of a dwelling-house fronting on North Ashby Street in the City of Atlanta near the Exposition Cotton Mills. The house consisted of four rooms so arranged as to form two

apartments of two rooms each. There was a porch along the front, and each apartment had a door opening directly on the porch. There was no hallway. The apartments were separated only by a "beaver-board" wall. The apartment on the right as you face the building was occupied by D. C. Skelton and his father. The one on the left was occupied by Bernie Ingram with his wife about 20 years of age and their infant, they having occupied the apartment only a few days. Skelton and Ingram were both employees of the Exposition Cotton Mills, the former working in the day and the latter in the night. The morning change or shifts occurred about 6 o'clock in the morning. On Friday morning, February 4, 1927, immediately after the shift—after Skelton ·had gone to work and Ingram had ceased to work, Ingram returned to his apartment and found the body of his wife in the bed in his front room, she having been killed by means of blows with a blunt instrument crushing the head and the body of his infant by her side, the latter having been killed by strangulation caused by drawing a cloth string tight about the neck. An alarm was given, and the officers immediately began an investigation. The bodies indicated that the homicide had occurred about two and a half or three hours before. Skelton was at first arrested, but after investigation was discharged without any formal charges being brought against him. The officers suspected Harold Hammond, attempted to find him but failed to do so, and did not succeed in arresting him until about a month later. Hammond was indicted for the murder of Mrs. Lottie Bell Ingram, and was convicted and sentenced to be executed. His motion for a new trial was overruled, and he excepted. One phase of the evidence showed all that is stated above, and the following:

About a year prior to the homicide the Ingrams lived on Fielder Street, and for a short time rented a part of the house to Hammond, who had a wife and child. The relations between the families were friendly, but not intimate. Ingram desired, for the use of certain relatives, the part of the house occupied by the Hammonds, and caused them to move. Subsequently Ingram moved to a house on Lindsey Street, and Hammond to an apartment on Peters Street. On the Sunday before the homicide, Ingram, having heard that Hammond had been inquiring where Ingram lived, went with Mullins (brother of Mrs. Ingram) to the Hammond

apartment and saw Hammond. The purpose was to ascertain the cause of the inquiries. At that meeting Ingram told Hammond that he would be at home after the ensuing week, and if he came that way he could come to see him. During the conversation Hammond said something about killing some one, but nothing seemed to be thought of the remark. On the following day (Monday) Ingram moved from the Lindsey Street residence to the Ashby Street apartment where the homicide occurred. Ingram testified that he moved because his wife said she was afraid of Hammond. On the ensuing Thursday afternoon Hammond was seen on Lindsey Street in the immediate vicinity of the Ingram's late residence, making inquiry for Ingram's house. He was told that the Ingrams had moved to the Ashby Street apartment. The next account of Hammond was at the home of a woman on East Fair Street, about four miles from the scene of the homicide. He was there in the late afternoon and again later in the night, and finally left there about two o'clock. He did not return to his home until after five o'clock Friday morning. He stated that he spent the time after leaving the woman's house in a vacant house in the same vicinity. Streetcars were running all night, by which he could have gone from the woman's house to the scene of the homicide. At about 3 o'clock a man called at a residence two or three doors from the Ingram apartment, and asked if it was the house of Ingram. He was informed that it was not, and after several more questions and answers he was directed to the Ingram apartment. Owing to darkness the witnesses could not identify the man by sight; they had never before heard the voice of the man, but, after the arrest of Hammond, heard him talk and in their opinion the voice of the man was that of Hammond.

Skelton testified that late in the night he was awakened by a man calling in front of the apartment house (759 Ashby Street). Witness responded to the call, and the man asked if Bernie Ingram lived there. At that time witness did not know who lived in the adjoining apartment, and did not give the information requested. Thereupon Mrs. Ingram responded, from her apartment, that Ingram "was not at home." The man stated to her that "the law was after him," and that he had seen Ingram, who had told him to tell her to let him spend the night in the house. She told him to come in. He opened the Ingram door and entered the room,

repeating his foregoing statement. They talked about five minutes in friendly conversation, and "witness went back to sleep." He did not see the man; nor did he hear any further noise in the Ingram apartment, except that about five o'clock in the morning he heard a man walk out through the back door. After the arrest of Hammond (a month later), witness was called upon by the detectives to go to the jail to see if he could identify his voice as the one he heard that night. The tests were made by first allowing witness from outside of a room to hear a conversation between Hammond and several other persons, then by hearing the conversation while seeing the several persons. He testified at the trial: "I could not swear positively that he is the man, but I could swear to the best of my knowledge that his voice sounded mighty like the voice that I heard talking to me at the front door that night. My best judgment is that is the same voice that I heard at my door. I could not swear it." At one time the witness testified that there was nothing peculiar about the voice, and at another that "it was finer, a little shriller than" the voices of those conversing with him at the jail. Skelton also testified that his father was not at home at the time of the homicide. There was evidence that a pallet had been laid down on the floor of the back room, and that a flat iron was found on the floor near the deceased, which had blood and hair adhering to it.

G. F. Sheffield testified that the defendant worked for him the day after the homicide, that he left home before he had his breakfast, and that the defendant said to him, "My wife was mad and wouldn't cook for me this morning," and he wanted a quarter to get him some lunch. "He told me he didn't know where he was the night before. He said, 'I was out all night, and don't know where I was at. I can not prove where I was at.' . . He said: 'Mr. Sheffield, you know I was out all night last night. I don't know where I was and don't know what I done. The last thing I remember about the time of night was when me and Bob passed a drug-store at five minutes past one. I remember going in two or three empty houses. I don't think we broke in anybody's house, but I don't know. I really don't know what I did do, and can not prove where I was at.'" Sheffield further testified: "Regarding the statement he made to me when I paid him off that day, he said: 'I am not going home.' He told me that in the office. He

said: 'Mr. Sheffield, I am not going home to-night. Would you mind stopping and telling my wife I am not coming home? I am afraid I have done something. Tell her to bring my best shirt down to my sister's, not to put it in a bundle, but to put it under her clothes and bring it to me on Pryor Street.' I said 'What number Mr. Hammond?' He said, 'She knows what number.' It was not his sister. It was one of her sisters. He said to bring his best shirt, and not to roll it up, but to put it under her clothes. He told me he was not going home. Regarding what his reason was for not going home—he said he was afraid he had done something and they would get him. He never mentioned anything that he had seen in the paper. He had a newspaper in his pocket. . . I heard Mr. Hammond make a remark about killing somebody that day. He did not say who he was going to kill. I don't know why he said he was going to kill some one. He just remarked that day: 'If I ever do anything, I aim to kill somebody so I will go on to hell where I belong.' " Sheffield further testified that the defendant told him that the night before he went out and received some whisky at a certain place, and was made drunk. He said, "I may have done something last night." "That nervous condition that I noticed was after he got that paper that morning. His statement to me about may be he had done something last night was after he got the paper. Regarding whether it was before or after I had brought him a message about the officers being there, I did not tell him anything about the officers being there. I didn't carry him any message."

Robert Graham, nephew of the defendant, testified: He met the defendant, about 6:30 o'clock on the evening of Friday after the homicide, on Woodward Avenue, and told the defendant that he wanted him to do some work for him, and the defendant said: "I can not go and do the work." "I says: 'Why?' He says: 'Hell, man! Ain't you heard the news?' I said: 'No, what is it?' He said: 'I am accused of killing a woman and baby out there on Ashby Street.' I said: 'Surely that is not so.' He said: 'They have got me accused of that and the officers are guarding my house now, and I can not go home.' He said: 'Come sit down. I want to sit down. I am tired. I have been working to-day.' We went and sat down a while and talked. We sat down and began talking about what they had him accused of. He says: 'I am not

guilty of this, Bob. I was out all night last night, drinking.' He said: 'I was out all night last night, drinking, and was at [a] woman's house over on East Fair Street. I raised cain over there, and she ran me off.' He says: 'I know pretty well where I was at about 12:00 or 12:30, but,' he says, 'after 12:30 I don't know what I done or where I went.'" Also that defendant endeavored to get witness to make up a story that would show that defendant was absent from the scene of the homicide. There was no evidence that any one had informed the defendant that the officers suspected him as perpetrator of this crime. In the prisoner's statement before the jury, he purported to account for all his actions on the Thursday night in question. On the Sunday following the homicide the defendant appeared at the home of his stepdaughter at Simsville, several miles from Atlanta, and exchanged his shirt. It contained spots of blood, for which he purported to account in his statement before the jury. He left Atlanta, went to other States, and returned about a month later, and was captured in the outskirts of the city. He claimed that his flight was because he was an escaped convict for past misdemeanor offenses, and thought the officers were after him on that account. He claimed to be an ignorant man, and did not explain why he was interested in the particular newspaper which Sheffield saw him have, or why he was interested in the murder of Mrs. Ingram and her child, or that any one had told him before his conversation with Graham that the officers were suspecting him of the murder. The day after the murder he told a friend that he was suspected as the murderer, and sought advice as to whether he should leave.

*Carl M. Lancaster, Harry L. McGriff,* and *H. E. Roland,* for plaintiff in error.

*George M. Napier, attorney-general, John A. Boykin, solicitor-general, T. R. Gress, assistant attorney-general, J. W. LeCraw,* and *E. A. Stephens,* contra.